**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CASE NO. 13-62588-MGD** |
| | ) | |
| **TRADE AM INTERNATIONAL, INC.,** | ) | **CHAPTER 7** |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| **S. GREGORY HAYS** | ) | |
| **CHAPTER 7 TRUSTEE FOR THE ESTATE OF** | ) | |
| **TRADE AM INTERNATIONAL, INC.** | ) | |
| | ) | **Adversary Proceeding** |
| Plaintiff, | ) | **No.** |
| | ) | |
| VS. | ) | |
| | ) | |
| **JUPITER IL, LLC, DEUTSCHE BANK AG,** | ) | |
| **Cayman Islands Branch,** | ) | |
| **CRATOS CLO I LTD.,** | ) | |
| **AJAY LOIWAL, HOLLAND, JOHNS** | ) | |
| **& PENNY, L.L.P., and** | ) | |
| **MARGARET HOLLLAND,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff S. Gregory Hays ("<u>Plaintiff</u>" or "<u>Trustee</u>"), Chapter 7 Trustee for the bankruptcy

estate of Trade Am International, Inc. ("<u>Trade Am</u>" or "<u>Debtor</u>"), files this *Complaint*

(the "<u>Complaint</u>") against Jupiter IL, LLC ("<u>Jupiter</u>"), Deutsche Bank AG, Cayman Islands

Branch ("<u>Deutsche Bank</u>"), Cratos CLO I LTD. ("<u>Cratos</u>"), Mr. Ajay Loiwal ("<u>Mr. Loiwal</u>"),

Ms. Margaret Holland ("<u>Ms. Holland</u>"), and Holland, Johns & Penny, L.L.P. f/k/a Holland Johns

and Schwartz LLP ("<u>HJP</u>"; together with Jupiter, Deutsche Bank, Cratos, Mr. Loiwal,

Ms. Holland, and HJP, collectively, the "<u>Defendants</u>").

6766469v1

### <u>Nature of this Action</u>

1.      In August of 2008, Trade Am's primary warehouse located in Duluth, Georgia suffered a catastrophic flood that resulted in extensive damage to Trade Am's inventory and other personal property, as well as significant losses to Trade Am's business income.  After Trade Am's insurer, The Cincinnati Insurance Company ("<u>CIC</u>"), refused to provide Trade Am with coverage for its damages, on November 17, 2008, Trade Am filed suit against CIC.  Although subsequent to the flood Trade Am continued to operate for approximately another two years, its business was permanently crippled by the damage to its warehouse and inventory, and Trade Am's most significant asset became its potential recovery in its insurance litigation against CIC.

2.      In the months leading up to Trade Am's trial with CIC, Trade Am's President, Mr. Loiwal, and Trade Am's sole shareholder, Mr. Ashu Ladha ("<u>Mr. Ladha</u>") recognized that even if Trade Am were to obtain a multi-million dollar judgment against CIC, the only beneficiaries of such a judgment would be Trade Am's secured creditors, Deutsche Bank and Cratos. Mr. Ladha and Mr. Loiwal used the only leverage they had: they informed Deutsche Bank and Cratos that Trade Am would not continue to actively pursue Trade Am's insurance litigation against CIC unless an "agreement" was reached whereby Trade Am's principals would receive a share of any prospective recovery.  To ensure Trade Am's continued pursuit of, and cooperation in, the CIC insurance litigation, Deutsche Bank and Cratos capitulated with Mr. Ladha and Mr. Loiwal's demands and agreed to forgo a share of their anticipated recovery from the insurance litigation proceeds in exchange for Trade Am and its officers' diligence. However, rather than secure this portion of the insurance proceeds for the benefit of the Debtor

and its creditors, as their fiduciary duties required, Mr. Loiwal and Mr. Ladha[1] instead set out to personally capitalize on Trade Am's corporate opportunity.

3.       With the aid of Trade Am's long-time corporate counsel, Ms. Holland and her law firm HJP, a "newco" named Jupiter IL, LLC was formed to capture this corporate opportunity. Mr. Loiwal, who at the time, was serving as the President of Trade Am, was, and upon information and belief, still is the sole owner of Jupiter.[2]  Shortly after Jupiter's formation, Deutsche Bank and Cratos assigned their interests in their secured loans to Trade Am to Jupiter, and took back participation interests in the secured loans that they had previously owned. Pursuant to their participation agreement with Jupiter, Deutsche Bank and Cratos became entitled to a percentage of the proceeds from any recovery in the CIC insurance litigation, with Jupiter serving as their agent and the holder of the loan.  As consideration for this transaction, Jupiter also agreed to pay Deutsche Bank and Cratos $300,000.00.  However, Jupiter did not bring any of its own funds to the table, and instead funded the required purchase price out of the proceeds of a precisely calculated and contemporaneous sale of certain of Trade Am's assets to a third party.  Contemporaneous with these agreements, Debtor's officers also caused Trade Am to enter into an agreement that committed Trade Am to sell the majority of its remaining assets for the benefit of Deutsche Bank and Cratos without the necessity of complying with applicable state laws related to bulk sales.

4.       Ultimately, Trade Am's litigation against CIC resulted in a judgment in favor of Trade Am in the amount of $9.12 million.  Under its negotiated arrangement with Deutsche Bank

---

[1]       Mr. Ladha filed a personal bankruptcy proceeding (Case No. 10-89992) on October 5, 2011, in the United States Bankruptcy Court for the Northern District of Georgia, and received a discharge in that proceeding on June 27, 2011 [Docket No. 63].  Accordingly, the Trustee has determined in his business judgment that from a cost-benefit analysis it is not an appropriate use of estate resources to attempt to reopen Mr. Ladha's case, revoke his discharge, and to pursue a claim against Mr. Ladha for breach of fiduciary duty.

[2]       Although Mr. Ladha was not a member of Jupiter, upon information and belief, Mr. Ladha had an oral agreement with Mr. Loiwal to benefit from this arrangement.

and Cratos, Jupiter's interest in that judgment is approximately $2.1 million—an interest that was purchased with the Debtor's funds and that under principles of both law and equity rightfully belongs to the Debtor.   Nonetheless, even though it did not provide a single dollar of its own money to purchase the loan, Jupiter, represented by HJP, asserted and demanded in its April 3, 2013 Letter (defined below) that it is entitled to all of the over $5.7 million in remaining Insurance Proceeds (defined below) that the Trustee is currently holding.

5.     Through this adversary proceeding, the Trustee seeks to recapture that multi-million dollar corporate opportunity that was usurped by the Debtor's former management team at the expense of the Debtor and its creditors.   The Trustee also seeks to recover monetary damages from Mr. Loiwal for breach of fiduciary duty related to his self-dealing.   The Trustee further seeks to recover monetary damages from the Debtor's long-time corporate counsel, former director, and corporate officer, Ms. Holland and her law firm HJP for their breach of their fiduciary duties, malpractice, and conspiracy with Mr. Ladha and Mr. Loiwal in breaching their fiduciary duties.   The Trustee also seeks to avoid and recover the transfer of $300,000 of the Debtor's funds, representing the proceeds from the sale of Trade Am's intellectual property and inventory, which were fraudulently transferred to Jupiter, and then utilized by Jupiter to fund the purchase of Deutsche Bank's and Cratos' secured loans.

6.     The specific categories of relief that the Trustee seeks through this Complaint are as follows:

> a.  a judgment equitably subordinating Jupiter's claim to the claims of all creditors pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a);
>
> b.  a judgment ordering that Jupiter's lien be transferred to the bankruptcy estate pursuant to 11 U.S.C. §§  510(c)(2) and 105(a);

c.  a declaratory judgment that Deutsche Bank is no longer a creditor of Trade Am on account of the Loan (defined below);

d.  a declaratory judgment that Cratos is no longer a creditor of Trade Am on account of the Loan;

e.  an award of monetary damages caused by certain Defendants breaching their fiduciary duties to the Debtor and Debtor's creditors;

f.  an award of monetary damages caused by certain Defendants conspiracy to breach their fiduciary duties to the Debtor and Debtor's creditors; and

g.  avoidance and recovery of a $300,000 fraudulent transfer made to various Defendants pursuant to 11 U.S.C. §§ 544 and 550, and applicable law.

## <u>Jurisdiction and Venue</u>

7.  This is an adversary proceeding commenced pursuant to Rules 7001(1), (8), and (9) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and 11 U.S.C. §§ 502, 510, 541, 544, and 550.  This adversary proceeding arises in and relates to the case of *In re Trade Am International, Inc.*, Chapter 7 Case No. 13-62588-MGD (the "<u>Case</u>") pending in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "<u>Court</u>").

8.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a).

9.  This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H), and (O), and this Court can constitutionally hear and determine this adversary proceeding.

10.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## The Parties

### Plaintiff

11.     On June 6, 2013 (the "Petition Date"), certain creditors of the Debtor commenced the Case by the filing of an involuntary Chapter 7 petition for relief against the Debtor pursuant to Title 11 of the United States Code, 11 U.S.C. §§ et seq. (the "Bankruptcy Code").

12.     On August 7, 2013, the order for relief was entered against the Debtor [Docket No. 25].   That same day, the United States Trustee filed a notice of appointment, appointing Trustee as the interim trustee in the Case and scheduled the Section 341(a) meeting of creditors for September 4, 2013 [Docket No. 37].

13.     On August 29, 2013, several parties filed notice of their intention to elect a trustee at the Section 341 meeting [Docket No. 41]. However, no one appeared on behalf of the Debtor at the Section 341 meeting.

14.     The United States Trustee was unable to convene the Section 341 meeting or conduct the requested election because the Debtor has not filed a list of creditors, as required by Rule 1007(a)(2) of the Bankruptcy Rules and as ordered by the Court.   Therefore, Trustee is the current legal representative of the Debtor's bankruptcy estate.

### Defendants

15.     Defendant, Jupiter IL, LLC, is a Texas limited liability company, which may be served with process in this action by mailing, by first class mail, postage prepaid, a true and correct copy of this Complaint and Summons to its registered agent: Margaret E. Holland at 306 West Seventh Street, Suite 500, Fort Worth, Texas 76102.

16.     Defendant, Deutsche Bank AG, Cayman Islands Branch, is a foreign bank, which may be served with process in this action by mailing, by first class mail, postage prepaid, a true

6

and correct copy of this Complaint and Summons to: Deutsche Bank AG, NY Branch, Legal Department, 60 Wall Street, New York, NY 10005..

17.    Defendant, Cratos CLO I LTD. may be served with process in this action by mailing, by first class mail, postage prepaid, a true and correct copy of this Complaint and Summons to: The Corporation Trust Company at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

18.    Defendant, Mr. Ajay Loiwal is a former director, corporate officer, and President of the Debtor, the sole member and manager of Jupiter, and a Georgia citizen, who may be served with process at his residence,1127 Antioch Drive NE, Atlanta, Georgia 30319-2303, by mailing, by first class mail, postage prepaid, a true and correct copy of this Complaint and Summons.

19.    Defendant, Holland, Johns & Penny, L.L.P. f/k/a Holland Johns and Schwartz LLP  is the long-time corporate counsel of Debtor, counsel to Jupiter, and a limited liability partnership registered to do business in the State of Texas, which may be served with process in this action by mailing, by first class mail, postage prepaid, a true and correct copy of this Complaint and Summons to one of its partners, Margaret Holland, at 306 West Seventh Street, Suite 500, Fort Worth, Texas 76102.

20.    Defendant, Ms. Margaret Holland is a Texas resident, a former director, corporate officer, and registered agent of the Debtor, and former legal counsel to the Debtor and counsel to Jupiter.  Ms. Holland resigned from her positions as corporate secretary and director of the Debtor in 2009.  Defendant Ms. Holland may be served with process at her residence 120 Williamsburg Lane, Fort Worth, Texas, 76107-1738, by mailing, by first class mail, postage prepaid, a true and correct copy of this Complaint and Summons.

**Factual Background**

**A.  Creation of Trade Am and Financing from Deutsche Bank and Cratos**

21.    In 1986, Mr. Ladha founded Trade Am, an importer and wholesaler of home furnishing products, including natural fiber and hand tufted wool rugs with natural latex backing. From its inception through the Petition Date, Mr. Ladha owned 100% of the common stock of Trade Am.  In addition to his sole ownership interest in the Debtor, Mr. Ladha also, at different times, served as President, general manager, and as a corporate officer and director of the Debtor.

22.    Trade Am was incorporated under the laws of the State of Texas.  However, its operations were based in Norcross, Georgia, with its primary warehouse located at 3312 North Berkley Lake Road, Duluth, Georgia 30096 (the "Facility").

23.    Trade Am's primary source of funding was a term loan facility and a revolving loan facility with Cratos and Deutsche Bank.

24.    On December 26, 2006, Trade Am executed that certain Credit Agreement (the "Original Credit Agreement") with Cratos, as the arranger and administrative agent for Deutsche Bank (collectively with Cratos, the "Lenders").  Pursuant to the Original Credit Agreement, the Lenders agreed to provide Trade Am with a term loan facility  (the "Term Loan") and a revolving loan facility (the "Line of Credit"; collectively, with the Term Loan, the "Loan"). A true and correct copy of the Original Credit Agreement is attached hereto as **Exhibit A**.

25.    As security for the Loan, Trade Am executed that certain Security Agreement dated December 26, 2006 (the "Security Agreement"), granting the Lenders a first priority security interest in all or substantially all of Trade Am's personal property and assets, including but not limited to, Trade Am's rights in its accounts, books and records, rights of payment, chattel paper, deposit accounts, equipment, general intangibles, inventory, investment property,

negotiable instruments, and commercial tort claims, and proceeds therefrom (the "Collateral") as more specifically defined in the Security Agreement. A true and correct copy of the Security Agreement is attached hereto as **Exhibit B**.

26.     Between February 21, 2007 and April 5, 2010, Trade Am and the Lenders amended the Original Credit Agreement eleven times, with the last amendment being that certain Eleventh Amendment to Credit Agreement, executed on April 5, 2010 (the Original Credit Agreement, collectively with all amendments thereto, the "Credit Agreement").

### B. Warehouse Flood and Insurance Litigation

27.     By 2008, Trade Am's yearly gross revenues exceeded $63 million.  However, between August 16, 2008 and August 18, 2008, an 8-inch overhead water pipe attached to the sprinkler system at the Facility ruptured, causing standing water of at least four to six inches in the back of the Facility.

28.     As a result of the water pipe break, Trade Am suffered significant damage to its inventory, loss of business income, and extra expenses.

29.     CIC provided insurance coverage to Trade Am, as outlined in insurance policy no. CPP-88-91-35, effective June 30, 2006 to June 30, 2009 (the "Policy"), including broad coverage for business personal property damage, loss of business income, and other losses at Trade Am's insured properties, which included the Facility.

30.     Upon discovery of the water pipe break on August 18, 2008, Trade Am submitted notice of the event to CIC that same day.  Although CIC issued an advance payment of $500,000 to Trade Am for property damage that occurred as result of the warehouse flood, CIC refused to provide Trade Am with any additional coverage.

31.     The water pipe break and CIC's denial of coverage, caused Trade Am to default under various customer contracts, and rendered Trade Am insolvent.

32.     The Debtor retained King & Spalding LLP ("K&S") to represent it in a lawsuit against CIC on a contingency fee basis, pursuant to which K&S was entitled to 50% of the first $4,000,000 recovered from CIC, 10% of any amount recovered from CIC between $4,000,000 and $6,000,000, and 35% of any amount recovered from CIC in excess of $6,000,000 (the "Contingency Fee Arrangement").

33.     On November 17, 2008, Debtor, through K&S, filed suit against CIC to recover under the Policy in the Superior Count of Gwinnett County, in an action which was designated Civil Action File No. 08-A-10171-5 (the "State Court Action").

34.     On December 8, 2008, the State Court Action was removed to federal district court in Trade Am International, Inc. v. The Cincinnati Insurance Company, N.D. Ga. CAFN 1:08-cv-03711-ECS (the "District Court Case").

35.     On April 1, 2009, Trade Am and the Lenders executed that certain Seventh Amendment to Credit Agreement, pursuant to which, among other things, the Credit Agreement was amended to provide K&S with a first priority interest in any recovery from the District Court Case, ahead of the Lenders, to the extent of Trade Am's obligations to K&S under the Contingency Fee Arrangement (the "Seventh Amendment"). A true and correct copy of the Seventh Amendment is attached hereto as **Exhibit C**.

**C. Negotiations with the Lenders related to the CIC Insurance Litigation**

36.     Recognizing that the Lenders would receive the entire recovery in the District Court Case after payment of K&S's Contingency Fee Arrangement, representatives of Trade Am,

including Mr. Ladha and Mr. Loiwal, entered into negotiations with the Lenders during the summer of 2010 to carve-out a portion of the anticipated recovery.

37.    Upon information and belief, the Lenders were informed from Trade Am representatives that if an agreement was not reached under which the Lenders agreed to share a portion of their potential recovery in the District Court Case, Trade Am's officers would either hastily settle the District Court Case on less than favorable terms or certain Trade Am employees, who were to be key witnesses, would be unavailable for trial or otherwise not cooperate.

38.    Representatives from Trade Am subsequently made multiple proposals to the Lenders.

39.    In a letter to the Lenders dated July 22, 2010 (the "July 22, 2010 Letter"), Nick Howard ("Mr. Howard"), the then acting Chief Financial Officer of Trade Am, proposed an arrangement whereby the Lenders would foreclose on Trade Am's assets and then sell those assets to a newly formed corporation, which would continue to pursue the District Court Case and operate in Trade Am's line of business using the purchased assets.  As consideration for Trade Am's assets, this new corporation would pay the Lenders $1,713,500 and 30% of any recovery in the District Court Case.  This would leave Trade Am, according to the July 22, 2010 letter, "devoid of any assets."  A true and accurate copy of the July 22, 2010 Letter is attached hereto as **Exhibit D**.

40.    In a letter to the Lenders dated July 29, 2010 (the "July 29, 2010 Letter"; together with the July 22, 2010 Letter, the "Letters"), Mr. Howard, on behalf of Trade Am, made an alternate proposal: a new corporation would be formed that would purchase the senior secured debt of Cratos and Deutsche Bank for $1,713,500 and 30% of any recovery in the District Court Case.  This new corporation would then foreclose on the assets of Trade Am and continue to

operate using Trade Am's former assets.  A true and correct copy of the July 29, 2010 Letter is attached hereto as **Exhibit E**.

41.    In both of the Letters, Mr. Howard, on behalf of Trade Am, represented to the Lenders that one of the advantages of working out an arrangement with Trade Am would be to prevent the District Court Case from settling at a reduced amount and to ensure that Trade Am's key witness participated in the District Court Case.

42.    Upon information and belief, neither of the proposals outlined in the Letters was acceptable to the Lenders.

43.    Upon information and belief, in August of 2010, in order to incentivize Trade Am's management to continue to litigate and cooperate in the District Court Case, the Lenders reached an oral agreement with representatives of Trade Am regarding the liquidation of Trade Am's assets and the division of potential proceeds in the District Court Case.  However, rather than capture this opportunity for the benefit of Trade Am and its creditors, as their fiduciary duties mandated, Mr. Ladha and Mr. Loiwal, with the assistance of Ms. Holland and HJP, instead elected to usurp this corporate opportunity and personally benefit from it.

44.    Upon information and belief, the oral agreement that the Lenders reached with the representatives from Trade Am provided for the creation of a new corporation that would purchase the Loan and the Lenders' security interest in the potential recovery in the District Court Case.  In exchange, the Lenders would receive participation interests in "newco's" recovery, entitling them to 30% of the first $4,000,000 recovered by "newco" in the District Court Case after payment of K&S's legal fees (which pursuant the Seventh Amendment were secured by a prior lien in favor of K&S) and 50% of any additional amounts recovered by "newco" in excess of $4,000,000 in the District Court Case after payment of K&S's legal fees

12

(which pursuant the Seventh Amendment were secured by a prior lien in favor of K&S). In addition, it was agreed that the Lenders would receive $300,000 from the liquidation of certain of Trade Am's assets and that a liquidator would be appointed to liquidate the remainder of Trade Am's assets on an expedited basis.

### D. Creation of Jupiter, Jupiter's Usurpation of Trade Am's Corporate Opportunity, and Liquidation of Trade Am

45.    In September of 2010, with the trial in the District Court Case fast approaching, Mr. Ladha, Mr. Loiwal, Ms. Holland, HJP, and the Lenders consummated the transactions (described below) that would prevent Trade Am and its creditors from realizing any benefit from Trade Am's officers' previous discussions with the Lenders regarding the District Court Case and/or from the District Court Case.

46.    Mr. Loiwal and Mr. Ladha did this notwithstanding the fact that, according to the certificate of incumbency filed by Mr. Ladha on September 10, 2010, Mr. Ladha was, at the time, the Chief Executive Officer of Trade Am and Mr. Loiwal was the President and Assistant Secretary of Trade Am.  A true and correct copy of the Certificate of Incumbency is attached hereto as **Exhibit F**.

47.    On September 15, 2010, the Debtor and Great American Group, LLC ("Great American") entered into that certain *Consulting Agreement* (the "Consulting Agreement"), as modified by that certain *Letter Agreement* dated September 21, 2010 between the Debtor, Great American, and Cratos (the "Letter Agreement"), pursuant to which Great American was to liquidate certain of the Debtor's assets on behalf of the Lenders. True and correct copies of the Consulting Agreement and the Letter Agreement are attached hereto as **Exhibit G**.

48.    Ms. Holland and HJP represented the Debtor in connection with the Consulting Agreement and the Letter Agreement.

49.    On September 20, 2010, Jupiter was formed as a Texas limited liability company. Mr. Loiwal was, and upon information and belief, remains the sole member and manager of Jupiter.

50.    Ms. Holland and HJP represented Jupiter in connection with its formation, and Mrs. Holland was named the registered agent for Jupiter.

51.    On September 21, 2010, Jupiter entered into that certain *Assignment and Assumption* agreement with Deutsche Bank whereby, among other things, Deutsche Bank assigned its interest in the Loan, the Security Agreement, the Credit Agreement, and related loan documents with the Debtor to Jupiter for the stated consideration of $284,118.93 (the "Deutsche Bank Assignment").

52.    On September 21, 2010, Jupiter also entered into that certain *Assignment and Assumption* agreement with Cratos whereby, among other things, Cratos assigned its rights and obligations as agent, and its interest, in the Loan, the Security Agreement, the Credit Agreement, and related loan documents to Jupiter for the stated consideration of $15,881.07 (the "Cratos Assignment"; together with the Deutsche Bank Assignment, the "Assignments"). True and correct copies of the Assignments are attached hereto as **Exhibit H**.

53.    Jupiter was represented by Ms. Holland and HJP in connection with the Assignments.

54.    As part of the transaction related to the Assignments (the "Loan Sale"), on September 21, 2010, Jupiter entered into that certain *Participation Agreement* with Deutsche and Cratos, pursuant to which Deutsche Bank and Cratos acquired undivided, full-risk, non-voting

participation interests (the "Participation Interests") in the Loan, including Debtor's obligations under the Credit Agreement (the "Participation Agreement"). A true and correct copy of the Participation Agreement is attached hereto as **Exhibit I**.

55.    Specifically, the Participation Interests entitle the Lenders to 30% of the first $4,000,000 recovered by Jupiter in the District Court Case after payment of K&S's legal fees (which pursuant the Seventh Amendment were secured by a prior lien in favor of K&S), and 50% of any amounts recovered by Jupiter in excess of $4,000,000 in the District Court Case after payment of K&S's legal fees (which pursuant the Seventh Amendment were secured by a prior lien in favor of K&S).

56.    Under the Participation Agreement, 5.2936889% of the Participation Interests are allocated to Cratos, with 94.7063111% of the remaining Participation Interests allocated to Deutsche Bank.

57.    Under the Participation Agreement, the Lenders also agreed that they would not have any interest in the proceeds from any of Trade Am's assets (the "Additional Assets") other than those being liquidated pursuant to the Consulting Agreement and the recovery in the District Court Case.

58.    Jupiter was represented by Ms. Holland and HJP in connection with the Participation Agreement.

59.    On or about September 21, 2010, the Debtor and a third party purchaser, LR Resources, Inc. ("LRRI"), entered into that certain *Warranty Bill of Sale and Agreement* (the "Bill of Sale"), pursuant to which LRRI purchased certain business operations, assets, and intellectual property of the Debtor (the "LRRI Sale") for $255,000 (the "Purchase Price"). A true and correct copy of the Bill of Sale is attached hereto as **Exhibit J**.

60.    The property sold in the LRRI Sale was part of the Additional Assets, to which the Lenders waived their interest.

61.    The Debtor was represented by Ms. Holland and HJP in connection with the Bill of Sale and the LRRI Sale.

62.    LRRI purchased those certain business operations, assets, and intellectual property of the Debtor by paying the Purchase Price—not directly to a bank account of the Debtor—but instead via wire transfer to escrow account no. xxxxx3165 at HJP ("LRRI Wire Transfer").  A true and correct copy of the wire advice for the LRRI Wire Transfer is attached hereto as **Exhibit K**.

63.    In contemplation of the Loan Sale, a few weeks earlier, on September 9, 2010, High Q Trading Co, LLC and Global Floor Covering LLC purchased certain assets of the Debtor for, collectively, $45,000 (the "High Q and Global Floor Sale").  The property sold in the High Q and Global Floor Sale was also part of the Additional Assets, to which the Lenders waived their interest.

64.    The funds representing the purchase price of the High Q and Global Floor Sale, like the LRRI Wire Transfer, were not transferred directly to a bank account of the Debtor, but were instead transferred via wire transfers to escrow account no. xxxxx3501 at HJP (collectively, the "High Q and Global Floor Wire Transfer";).  A true and correct copy of the wire advice for the High Q and Global Floor Wire Transfer is attached hereto as **Exhibit L**.

65.    On September 21, 2010, on behalf of Debtor, HJP caused $300,000 of the Debtor's funds, which represented the proceeds of the sale of certain of the Additional Assets generated through the LRRI Sale and the High Q and Global Floor Sale, to be transferred, upon information and belief, first to Jupiter (the "Jupiter Fraudulent Transfer"), and then to the

Lenders via wire transfer from escrow account no. xxxxx3165 at HJP (the "Lender Wire Transfer"; collectively with the LRRI Wire Transfer, and the High Q and Global Wire Transfer, the "Wire Transfers"). A true and correct copy of the wire advice for the Lender Wire Transfer is attached hereto as **Exhibit M**. The Lender Wire Transfer represented the stated consideration paid by Jupiter for the Assignments.

66. Prior to September 21, 2010, Trade Am was not known to owe any money to Jupiter, and Jupiter did not provide the Debtor with any consideration for use of the funds that constituted the Jupiter Fraudulent Transfer.

67. On September 21, 2010, Trade Am essentially ceased operating, at which time virtually all employees of Trade Am were terminated or resigned from their positions.

68. Mr. Ladha and Mr. Loiwal, however, remained employed by the Debtor. Mr. Loiwal and Mr. Ladha remained on the Debtor's payroll through, at least, December 31, 2010. A true and correct redacted copy of the Debtor's check register for the period ending December 31, 2010 is attached hereto as **Exhibit N**. The Debtor's check register indicates that Mr. Ladha and Mr. Loiwal each earned $3,846.11 for this pay period.

69. Mr. Ladha and Mr. Loiwal also continued to receive health insurance through the Debtor through, at least, January 31, 2011. A true and correct redacted copy of the Debtor's health insurance billing through January 31, 2011 is attached hereto as **Exhibit O**. The Debtor's health insurance billing reflects medical dues for that period for Mr. Ladha in the amount of $915.26 and for Mr. Loiwal in the amount of $1,525.43.

70. Notwithstanding their continued employment with and management of the Debtor through at least the end of 2010, Mr. Ladha and Mr. Loiwal have failed to cause the Debtor to file state or federal tax returns since 2007.

71.     Upon information and belief, at no point in time did Ms. Holland or HJP obtain a conflict waiver from either Trade Am or Jupiter related to the Loan Sale, the Bill of Sale, the LRRI Sale, the Assignments, the Participation Agreement, the Consulting Agreement, the Letter Agreement, the Wire Transfers, the Jupiter Fraudulent Transfer, or even discuss the existence of a conflict of interest between Trade Am and Jupiter.

72.     After the Consulting Agreement, the Letter Agreement, the Assignments, the Bill of Sale, the Participation Agreement, the Wire Transfers, and the Jupiter Fraudulent Transfer were executed and implemented, and the Loan Sale, High Q and Global Floor Sale, and the LRRI Sale closed, Trade Am was left holding assets totaling $452,240 with liabilities totaling more than $33.4 million.   A true and correct copy of Trade Am's consolidated unaudited balance sheet as of September 20, 2010 is attached hereto as **Exhibit P**.   As reflected in Debtor's Statement of Financial Affairs and Schedules [Docket No. 124], as of the Petition Date, the Debtor had over $31.2 million in unsecured claims.

73.     As a result of the Loan Sale, High Q and Global Floor Sale, and the LRRI Sale, Trade Am and its creditors were effectively left without any financial stake in the District Court Case.

**E. Jury Award, Appeal, and Trustee's Collection of the Insurance Proceeds**

74.     The trial in the District Court Case began on October 4, 2010.

75.     Upon information and belief, Mr. Loiwal was in India during the trial in the District Court Case and did not participate in or serve as a witness at the trial.

76.     On October 19, 2010, the jury awarded the Debtor damages in the amount of $9,120,000 against CIC.   On October 26, 2010, the District Court entered a judgment against

CIC in the amount of $9,120,000 in the District Court Case (the "Judgment").    A true and correct copy of the Judgment is attached hereto as **Exhibit Q**.

77.    CIC appealed the Judgment, which was subsequently affirmed by the Eleventh Circuit Court of Appeals on January 28, 2013.

78.    In April 2013, consistent with the Seventh Amendment, CIC paid K&S, Debtor's counsel in the District Court Case, approximately $3.5 million in partial satisfaction of the Judgment.

79.    The Trustee pursued collection of the remaining portion of the Judgment, and CIC subsequently paid the Trustee approximately $5.7 million (the "Insurance Proceeds") in satisfaction of the remaining portion of the Judgment.

80.    As explained in a letter from HJP, on behalf of Jupiter, to CIC dated April 3, 2013 (the "April 3, 2013 Letter"), Jupiter claims its lien attaches, and that it is entitled to all of the Insurance Proceeds.    A true and correct copy of the April 3, 2013 Letter is attached hereto as **Exhibit R**.

## COUNT I

## Equitable Subordination of Jupiter's Claim under 11 U.S.C. §§ 510(c)(1) and 105(a)
(Against Jupiter)

81.    The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

82.    At the time of Loan Sale, the High Q and Global Floor Sale, and the LRRI Sale, Mr. Loiwal was the president of the Debtor, and the sole owner and manager of Jupiter. Accordingly, through Mr. Loiwal, Jupiter controlled the Debtor, and was therefore an insider of the Debtor.

83.     Jupiter engaged in inequitable conduct, including but not limited to, usurping the Debtor's corporate opportunity to purchase the Loan from the Lenders and recover a portion of the Insurance Proceeds for the benefit of the Debtor and its creditors, and using the Debtor's funds without any consideration to the Debtor to fund the stated purchase price of the Loan through the Assignments and related agreements.

84.     This inequitable conduct has resulted in injury to Debtor's creditors and/or conferred an unfair advantage on Jupiter, in that the other creditors of the Debtor could have and should have benefited from the Assignments and related agreements, instead of Jupiter.

85.     As a result of Jupiter's inequitable conduct, secured and unsecured creditors are less likely to recover the full amount of their claims.

86.     Jupiter's inequitable conduct has resulted in an unfair advantage to Jupiter because, absent subordination, it will receive a windfall because it usurped the Debtor's corporate opportunity and did not provide any value in exchange for the Jupiter Fraudulent Transfer, which was the stated consideration for its purchase of the Loan.  Under principles of equitable subordination, Trustee is entitled to a judgment subordinating the entire amount of Jupiter's claim against the Debtor's estate to the claims of all of Debtor's other creditors pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a).

## COUNT II

### Transfer of Jupiter's Lien to the Estate under 11 U.S.C. §§ 510(c)(2) and 105(a) (Against Jupiter)

87.     The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

88.     Under principles of equitable subordination, Trustee is entitled to a judgment transferring any and all liens securing Jupiter's claim against the Debtor to the Debtor's bankruptcy estate, pursuant to 11 U.S.C. §§ 510(c)(2) and 105(a).

## COUNT III

### Declaratory Judgment
### (Against Deutsche Bank)

89.     The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

90.     Upon information and belief, Deutsche Bank claims that it maintains a security interest in the Insurance Proceeds, and that such funds constitute its cash collateral.  *See* Docket Nos. 69, 94.

91.     An actual controversy of a justiciable nature currently exists as to whether Deutsche Bank holds a valid security interest in the Insurance Proceeds, holds a claim against the Debtor, and whether Deutsche Bank is therefore a creditor of the Debtor.

92.     The Trustee contends Deutsche Bank, as a part of the Deutsche Bank Assignment and the Participation Agreement, sold its claim against the Debtor and its security interest in any of the Debtor's assets, including the Insurance Proceeds, to Jupiter, and in turn, took a mere participation interest in the Loan, which is now held by Jupiter.

93.     Therefore, Deutsche Bank does not hold a claim against and is not a creditor of the Debtor related to the Loan.

94.     Accordingly, the Trustee is entitled to a judgment declaring that Deutsche Bank does not hold a security interest in the assets of the Debtor, including the Insurance Proceeds, and does not hold a claim against the Debtor related to the Loan.

## COUNT IV

### Declaratory Judgment
### (Against Cratos)

95.     The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

96.     Upon information and belief, Cratos claims that it maintains a security interest in the Insurance Proceeds, and that such funds constitute its cash collateral.

97.     An actual controversy of a justiciable nature currently exists as to whether Cratos holds a valid security interest in the Insurance Proceeds, holds a claim against the Debtor, and whether Cratos is therefore a creditor of the Debtor.

98.     The Trustee contends Cratos, as a part of the Cratos Assignment and the Participation Agreement, sold its claim against the Debtor and its security interest in the Debtor's assets, including the Insurance Proceeds, to Jupiter, and in turn, took a mere participation interest in the Loan, which is now held by Jupiter.

99.     Therefore, Cratos does not hold a claim against and is not a creditor of the Debtor related to the Loan.

100.     Accordingly, the Trustee is entitled to a judgment declaring that Cratos does not hold a security interest in any of the assets of the Debtor, including the Insurance Proceeds, and does not hold a claim against the Debtor related to the Loan.

## COUNT V

### Breach of Fiduciary Duty
### (Against Mr. Loiwal)

101.     The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

22

102.     Pursuant to 11 U.S.C. §§ 541, 544, and other applicable law, the Trustee stands in the shoes of the Debtor and its creditors and has standing to sue for harm caused by the actions of the Debtor's officers, directors, and fiduciaries.

103.     As the President of the Debtor, Mr. Loiwal owed the Debtor fiduciary duties of care and loyalty.

104.     Upon the Debtor's insolvency, Mr. Loiwal also owed a fiduciary duty to the Debtor's creditors.

105.     Mr. Loiwal breached his fiduciary duties to the Debtor and its creditors by forming Jupiter and orchestrating Jupiter's use of the Debtor's assets to purchase the Loan and related security interests in the Debtor's assets, including the Insurance Proceeds.

106.     This opportunity to purchase the Loan and related security interests in the Debtor's assets, including the Insurance Proceeds, was an opportunity that the Debtor had a legitimate interest or expectancy in and had the financial resources to take advantage of, as evidenced by the fact that Jupiter used the Debtor's property to fund the stated purchase price under the Assignments.

107.     Mr. Loiwal's usurpation of the Debtor's corporate opportunity and his breach of his fiduciary duty caused harm to the Debtor and the Debtor's creditors because it deprived the Debtor's estate of a valuable and significant asset, and made that asset unavailable to satisfy the Debtor's liabilities to its creditors.

108.     The Trustee is entitled to collect from Mr. Loiwal all damages for these breaches to the extent permitted by applicable law.

## COUNT VI

### Breach of Fiduciary Duty
### (Against Ms. Holland and HJP)

109.    The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

110.    Pursuant to 11 U.S.C. §§ 541, 544, and other applicable law, the Trustee stands in the shoes of the Debtor and its creditors and has standing to sue for harm caused by the actions of the Debtor's officers, directors, and fiduciaries.

111.    By virtue of the attorney-client relationship that existed between Ms. Holland and HJP, and the Debtor, Ms. Holland and HJP each owed the Debtor fiduciary duties of care and loyalty.

112.    The Debtor had a corporate opportunity to purchase the Loan and related security interests in the Debtor's assets, including the Insurance Proceeds, which was an opportunity that the Debtor had a legitimate interest or expectancy in and had the financial resources to take advantage of, as evidenced by the fact that Jupiter used the Debtor's property to fund the stated purchase price under the Assignments.

113.    Ms. Holland and HJP breached their fiduciary duties of care and loyalty by forming Jupiter and orchestrating Jupiter's use of the Debtor's assets to purchase the Loan and related security interests in the Debtor's assets, including the Insurance Proceeds, by representing both the Debtor and the entity that usurped a corporate opportunity of the Debtor, Jupiter, in connection with substantially related transactions.

114.    Ms. Holland and HJP's breaches of their fiduciary duties of care and loyalty caused harm to the Debtor because it deprived the Debtor's estate of a valuable and significant asset, and made that asset unavailable to satisfy the Debtor's liabilities to its creditors.

115.    The Trustee is entitled to collect from Ms. Holland and HJP, jointly and severally, all damages for these breaches to the extent permitted by law.

## COUNT VII

### Breach of Fiduciary Duty-Legal Malpractice and Negligence (Against Ms. Holland and HJP)

116.    The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

117.    Pursuant to 11 U.S.C. §§ 541, 544, and other applicable law, the Trustee stands in the shoes of the Debtor and its creditors and has standing to sue for harm caused by the actions of the Debtor's officers, directors, and fiduciaries.

118.    By virtue of the attorney-client relationship that existed between Ms. Holland and HJP, and the Debtor, Ms. Holland and HJP each owed the Debtor fiduciary duties of care and loyalty.

119.    The Debtor had a corporate opportunity to purchase the Loan and related security interests in the Debtor's assets, including the Insurance Proceeds, which was an opportunity that the Debtor had a legitimate interest or expectancy in and had the financial resources to take advantage of, as evidenced by the fact that Jupiter used the Debtor's property to fund the stated purchase price under the Assignments.

120.    Ms. Holland and HJP breached their fiduciary duties of care and loyalty by failing to adequately advise the Debtor to capture the corporate opportunity available to it and to counsel against the liquidation of the Debtor's assets for the benefit of another entity, one that was also represented by Ms. Holland and HJP.

121. Ms. Holland and HJP failed to perform their professional services in a non-negligent manner, and in accordance with applicable care, skill, prudence, and diligence that members of the legal profession commonly possess and exercise.

122. Ms. Holland and HJP's breaches of their fiduciary duties of care caused harm to the Debtor because it deprived the Debtor's estate of a valuable and significant asset, and made that asset unavailable to satisfy the Debtor's liabilities to its creditors, and resulted in the depletion of the Debtor's remaining assets.

123. The Trustee is entitled to collect from Ms. Holland and HJP, jointly and severally, all damages for these breaches to the extent permitted by law.

## COUNT VIII

### Civil Conspiracy to Breach Fiduciary Duty
### (Against Ms. Holland HJP, and Jupiter)

124. The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

125. Pursuant to 11 U.S.C. §§ 541, 544, and other applicable law, the Trustee stands in the shoes of the Debtor and its creditors and has standing to sue for harm caused by the actions of the Debtor's officers, directors, and fiduciaries.

126. As outlined above, Mr. Loiwal owed the Debtor the fiduciary duties of care and loyalty as an officer of the Debtor. In addition, Mr. Loiwal owed fiduciary duties to the Debtor's creditors upon the Debtor's insolvency.

127. Mr. Loiwal violated these fiduciary duties by forming Jupiter and orchestrating Jupiter's use of the Debtor's assets to purchase the Loan and related security interests in the Debtor's assets, including the Insurance Proceeds.

128.    This opportunity to purchase the Loan and related security interest in the Debtor's assets, including the Insurance Proceeds, was an opportunity that the Debtor had a legitimate interest or expectancy in and had the financial resources to take advantage of, as evidenced by the fact that Jupiter used the Debtor's property to fund the stated purchase price under the Assignments.

129.    Mr. Loiwal's usurpation of the Debtor's corporate opportunity and his breach of his fiduciary duty caused harm to the Debtor because it deprived the Debtor's estate of a valuable and significant asset, and made that asset unavailable to satisfy the Debtor's liabilities to its creditors.

130.    Ms. Holland, HJP, and Jupiter (collectively, the "Co-Conspirators") knew or should have known of Mr. Loiwal's fiduciary duties to the Debtor and to the Debtor's creditors.

131.    The Co-Conspirators knowingly agreed, assisted, and/or conspired with Mr. Loiwal to breach his fiduciary duties to the Debtor and its creditors by making overt acts in furtherance of the conspiracy, including among other things: (1) forming Jupiter; (2) representing Jupiter in connection with the Assignments and the Participation Agreement; (3) representing the Debtor in connection with the LRRI Sale; (4) representing Debtor and Jupiter in connection with the Jupiter Fraudulent Transfer; and (5) assisting Mr. Loiwal to cause the Debtor to make the Jupiter Fraudulent Transfer to Jupiter and ultimately to Deutsche Bank and Cratos via the Lender Wire Transfer to fund its purchase price under the Assignments.

132.    The Co-Conspirators actively directed, participated in, and designed the wrongful conduct of Mr. Loiwal and Jupiter.

133.    The Co-Conspirators helped to procure Mr. Loiwal's breaches of fiduciary duty for the express purpose of harming creditors of the Debtor and benefitting Jupiter, Mr. Loiwal, Ms. Holland, and HJP.

134.    The Co-Conspirators had a meeting of the minds to use unlawful means, namely the breaching of fiduciary duties and orchestrating fraudulent transfers and other wrongful conduct as alleged herein, to ensure that Jupiter acquire an interest in the Additional Assets, including the Insurance Proceeds, at the expense of the Debtor's other creditors.

135.    The Debtor has been damaged as a proximate result of this conspiracy.

136.    The Trustee is entitled to collect from the Co-Conspirators, jointly and severally, all damages for these breaches to the extent permitted by law.

## COUNT IX

### Avoidance of the Jupiter Fraudulent Transfer to Jupiter
### Pursuant to 11 U.S.C. § 544 and O.C.G.A. § 18-2-74(a)(1)
### (Against Jupiter)

137.    The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

138.    The Jupiter Fraudulent Transfer was a transfer of an interest of the Debtor in property.

139.    The Jupiter Fraudulent Transfer was made to Jupiter within four (4) years of the Petition Date.

140.    The Debtor made the Jupiter Fraudulent Transfer with actual intent to hinder, delay, or defraud Debtor's creditors, as indicated by several badges of fraud, including: (a) Jupiter is an insider of Debtor; (b) the Jupiter Fraudulent Transfer was not an arms-length transaction and was made to enable Jupiter to usurp a corporate opportunity of the Debtor; (c)

Debtor made the Jupiter Fraudulent Transfer without receiving reasonably equivalent value, or indeed, any consideration; and (d) upon information and belief, the Jupiter Fraudulent Transfer was made when Debtor was insolvent or the Jupiter Fraudulent Transfer rendered the Debtor insolvent.

141.    Pursuant to the "strong arm powers" set forth in 11 U.S.C. § 544, the Trustee is entitled to avoid the Jupiter Fraudulent Transfer to Jupiter pursuant to O.C.G.A. § 18-2-74(a)(1).

### COUNT X

**Avoidance of the Jupiter Fraudulent Transfer to Jupiter**
**Pursuant to 11 U.S.C. § 544 and O.C.G.A. § 18-2-75(a)**
**(Against Jupiter)**

142.    The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

143.    The Jupiter Fraudulent Transfer was a transfer of an interest of the Debtor in property.

144.    The Jupiter Fraudulent Transfer was made to Jupiter within four (4) years of the Petition Date.

145.    The Debtor did not receive reasonably equivalent value in exchange for the Jupiter Fraudulent Transfer.

146.    The Debtor was insolvent at the time of the Jupiter Fraudulent Transfer or was rendered insolvent by the Jupiter Fraudulent Transfer.

147.    Pursuant to the Trustee's strong arm powers as set forth in 11 U.S.C. § 544, the Trustee may avoid the Jupiter Fraudulent Transfer pursuant to O.C.G.A. § 18-2-75(a).

## COUNT XI

**Recovery of the Avoided Jupiter Fraudulent Transfer to Jupiter
Pursuant to 11 U.S.C. § 550
(Against Jupiter)**

148.    The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

149.    Jupiter was the entity for whose benefit the Jupiter Fraudulent Transfer was made, the initial transferee of the Jupiter Fraudulent Transfer, or the immediate or mediate transferee of the initial transferee of the Jupiter Fraudulent Transfer.

150.    Pursuant to 11 U.S.C. § 550(a), the Trustee may recover the Jupiter Fraudulent Transfer or its value from Jupiter.

## COUNT XII

**Recovery of the Avoided Jupiter Fraudulent Transfer to the Lenders
Pursuant to 11 U.S.C. § 550
(Against Deutsche Bank and Cratos)**

151.    The Trustee hereby incorporates all of the foregoing allegations as if fully set forth at length herein.

152.    Deutsche Bank and Cratos were the entities for whose benefit the Jupiter Fraudulent was made, the initial transferees of the Jupiter Fraudulent Transfer, or the immediate or mediate transferees of the initial transferee of the Jupiter Fraudulent Transfer.

153.    Pursuant to 11 U.S.C. § 550(a), the Trustee may recover the Jupiter Fraudulent Transfer or its value from Deutsche Bank and Cratos.

### RESERVATION OF RIGHTS

154.    Trustee reserves the right to amend this Complaint should facts be discovered to add additional parties, to add additional transfers, and to assert additional claims, including but

not limited to claims of breach of fiduciary duty, aiding and abetting, conspiracy, and any and all claims arising under Title 11 of the United States Code or applicable law.

**WHEREFORE**, the Trustee prays that the Court enter judgment:

a) Ordering that Jupiter's entire claim is subordinated to the claims of all other creditors pursuant to 11 U.S.C. §§ 510(c)(1) and 105(a);

b) Transferring any and all liens securing Jupiter's claim against the Debtor to the Debtor's bankruptcy estate, pursuant to 11 U.S.C. §§ 510(c)(2) and 105(a);

c) Declaring that Deutsche Bank does not hold a security interest in any property of the Debtor or the Debtor's bankruptcy estate, including the Insurance Proceeds, or a claim against the Debtor by virtue of the Loan;

d) Declaring that Cratos does not hold a security interest in any property of the Debtor or the Debtor's bankruptcy estate, including the Insurance Proceeds, or a claim against the Debtor by virtue of the Loan;

e) Enter judgment finding Mr. Loiwal liable for the damages caused to the Debtor and the Debtor's creditors resulting from the breaches of his fiduciary duties to the Debtor and the Debtor's creditors;

f) Enter judgment finding Ms. Holland and HJP, jointly and severally, liable for the damages caused to the Debtor and the Debtor's creditors resulting from their breaches of their fiduciary duties to the Debtor and the Debtor's creditors;

g) Enter judgment finding Ms. Holland and HJP, jointly and severally, liable for the damages caused to the Debtor and the Debtor's creditors resulting from their negligence and malpractice;

h) Enter judgment finding Ms. Holland, HJP, and Jupiter, jointly and severally, liable for the damages caused to the Debtor and the Debtor's creditors resulting from their conspiring with Mr. Loiwal to breach his fiduciary duties to the Debtor and the Debtor's creditors;

i) Avoiding the Jupiter Fraudulent Transfer to Jupiter pursuant to 11 U.S.C. § 544 and O.C.G.A. § 18-2-74;

j) Avoiding the Jupiter Fraudulent Transfer to Jupiter pursuant to 11 U.S.C. § 544 and O.C.G.A. § 18-2-75;

k) Allowing recovery of the Jupiter Fraudulent Transfer or its value pursuant to 11 U.S.C. § 550, including through judgments holding Jupiter, Deutsche Bank, and/or Cratos liable for such transfers or their value; and

l) Granting any further relief that this Court deems just and proper.


Dated: September 8, 2014        Respectfully submitted,

ARNALL GOLDEN GREGORY LLP

*/s/ Sean C. Kulka*
Sean C. Kulka, Ga. Bar No. 648919
Jonathan H. Azoff, Ga. Bar No. 754305
171 17th Street, N.W., Suite 2100
Atlanta, GA 30363
Phone: (404) 873-8500
sean.kulka@agg.com
jonathan.azoff@agg.com

*Attorneys for Chapter 7 Trustee*
*S. Gregory Hays*